UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTHERN ILLINOIS
BENTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>MARATHON PIPE LINE LLC, )<br><br>Defendant. ) | Case No. <u>11-1123-DRH/SCW</u><br><br><u>CONSENT DECREE</u> |

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................- 3 -

II.     JURISDICTION AND VENUE ........................................................- 5 -

III.    PARTIES BOUND ..........................................................................- 5 -

IV.     DEFINITIONS .................................................................................- 6 -

V.      GENERAL PROVISIONS ...............................................................- 9 -

VI.     PERFORMANCE OF RESTORATION PROJECT .........................- 9 -

VII.    PAYMENTS BY THE DEFENDANT..............................................- 13 -

VIII.   INDEMNIFICATION......................................................................- 15 -

IX.     FORCE MAJEURE .........................................................................- 16 -

X.      DISPUTE RESOLUTION ................................................................- 18 -

XI.     STIPULATED PENALTIES ............................................................- 19 -

XII.    COVENANTS AND RESERVATION OF RIGHTS BY PLAINTIFF....................- 21 -

XIII.   COVENANT BY THE DEFENDANT ..............................................- 24 -

XIV.    EFFECT OF SETTLEMENT ...........................................................- 24 -

XV.     NOTICES AND SUBMISSIONS .....................................................- 25 -

XVI.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ............................- 26 -

XVII.   EFFECTIVE DATE AND RETENTION OF JURISDICTION ................................- 27 -

XVIII.  CONSENT DECREE MODIFICATIONS ........................................- 27 -

XIX.    APPENDICES .................................................................................- 28 -

XX.     SIGNATORIES/SERVICES ............................................................- 28 -

XXI.    FINAL JUDGMENT ......................................................................- 29 -

# I.     BACKGROUND

A.      Simultaneously with the lodging of this Consent Decree, the United States of America ("United States" or "Plaintiff"), on behalf of the Secretary of the United States Department of the Interior ("DOI"), acting through the United States Fish and Wildlife Service ("FWS") (collectively "Plaintiff"), has filed a Complaint against Marathon Pipe Line LLC ("Marathon" or "Defendant") pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*

B.      In the Complaint, the United States alleges that the Defendant is liable for injury to, destruction of, loss of, or loss of use of certain Natural Resources resulting from an August 10, 2008 release of approximately 5,000 barrels of crude oil from a 20-inch subsurface pipeline owned by Marathon, into the floodplain of Elm Creek (the "Discharge Incident"). The Elm Creek floodplain in this area contains mature hardwood forest patches, the former channels of Elm Creek, and floodplain wetlands that contain shallow water for parts of the year. Elm Creek flows into the Little Wabash River. The Little Wabash River flows into the Wabash River, which empties into the Ohio River.

C.      Marathon is a Delaware limited liability company that is licensed to do business in Illinois.

D.      Pursuant to Executive Order 12580, as amended by Executive Order 12777, and the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, DOI has been delegated authority to act as the Federal Trustee for the Natural Resources affected by the Discharge Incident.

E.      The United States alleges that the Discharge Incident resulted in injury to Natural Resources, including a freshwater wetland habitat and the plant and wildlife species which use that habitat.

F.      In accordance with OPA and its implementing regulations, DOI prepared a Natural Resource Damages Assessment and Restoration Planning ("DARP") Report, dated November 2010, revised March 2011 and revised August 2011, that was subject to public notice and comment.  A copy of the DARP Report is attached hereto and is incorporated herein by reference as Appendix A.  The purpose of the DARP Report was to inform the public about the affected environment and the restoration actions proposed to compensate for injuries caused by the Discharge Incident to Natural Resources and their services.  The DARP Report was developed in cooperation with the Defendant.  DOI did not receive any public comments on the DARP Report.

G.      Neither the execution of this Consent Decree by the Defendant nor the entry of this Consent Decree by the United States District Court shall be deemed or construed to be: (1) an admission of liability by the Defendant of any liability arising out of the transactions or occurrences alleged in the Complaint; or (2) an affirmation of the Plaintiff's assessment of the Natural Resource Damages resulting from the Discharge Incident.

H.      The United States and Defendant (collectively, the "Parties") agree that settlement of this case without further litigation and without admission, adjudication or determination of any issue of fact or law, except as specified herein, is the most appropriate means of resolving this action.

I.      The Parties agree, and the Court by entering this Consent Decree finds, that this Consent Decree:  (i) has been negotiated by the Parties in good faith; (ii) will avoid prolonged

and complicated litigation among the parties; (iii) will expedite performance of Natural Resource

restoration activities; and (iv) is fair, reasonable, and in the public interest.

NOW THEREFORE, it is hereby Ordered, Adjudged, and Decreed as follows:

## II.   JURISDICTION AND VENUE

1.      This court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1345, and OPA Section 1017(b), 33 U.S.C. § 2717(b).  This Court also has

personal jurisdiction over the Defendant.  The United States is authorized to bring this action

pursuant to 33 U.S.C. § 2717.  Solely for the purposes of this Consent Decree, including the

enforcement thereof, and the underlying Complaint, the Defendant waives all objections and

defenses that it may have to jurisdiction of this Court or to venue in this District.  The Defendant

shall not challenge the terms or validity of this Consent Decree or contest this Court's

jurisdiction to enter or enforce this Consent Decree in this or any subsequent proceeding arising

from it.

## III.   PARTIES BOUND

2.      This Consent Decree is binding upon the United States, the Defendant, and their

successors and assigns.  Any change in ownership or corporate or other legal status including,

but not limited to, any transfer of assets or real or personal property, shall in no way alter the

status or responsibilities of the Defendant under this Consent Decree.

3.      The undersigned representative of the Defendant certifies that he or she is fully

authorized to enter into the terms and conditions of this Consent Decree and to execute and bind

legally the Defendant to this document, and has identified on the attached signature page, the

name and address of an agent who is authorized to accept service of process by mail on behalf of

that party with respect to all matters arising under or relating to this Consent Decree.  The

Defendant shall notify the U.S. Department of Justice and DOI of any change in the identity or address of the Defendant, its agent for service, or its counsel.

4.      The Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  The Defendant shall be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.

## IV.    DEFINITIONS

5.      Unless otherwise defined herein, terms used in this Consent Decree that are defined in OPA, 33 U.S.C. § 2701, or in regulations promulgated pursuant to OPA, *e.g.*, 15 C.F.R. Part 990, shall have the meaning assigned to them in that statute or regulation.  Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply.

a.      "Consent Decree" shall mean this Consent Decree and all appendices attached hereto.  All appendices are incorporated herein by reference.

b.      "Day" shall mean a calendar day, unless expressly stated to be a working day.  "Working Day" shall mean a day other than a Saturday, Sunday or Federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of the business of the next Working Day.

c.      "Defendant" shall mean Marathon Pipe Line LLC.

d.      "DOI" shall mean the United States Department of the Interior and any successor departments or agencies of the United States.

- 6 -

e.      "Effective Date" shall mean the effective date of this Consent Decree as provided in Section XVII of this Consent Decree (Effective Date and Retention of Jurisdiction).

f.      "FWS" shall mean the Fish and Wildlife Service of the United States Department of the Interior, and any successor departments or agencies of the United States.

g.      "Force Majeure Event" shall mean any event arising from causes beyond the control of the Defendant, of any entity controlled by the Defendant, or of Defendant's contractors and subcontractors, that delays or prevents the performance of any obligation under this Consent Decree despite the Defendant's best efforts to anticipate any potential Force Majeure Event and best efforts to address and mitigate the effects of any potential Force Majeure Event (1) as it is occurring and (2) following the potential Force Majeure Event, such that the delay is minimized to the greatest extent possible.  Financial inability to fulfill any obligations under this Consent Decree does not constitute a Force Majeure Event.

h.      "Interest" shall mean interest calculated in the manner specified by OPA Section 1005(b)(4), 33 U.S.C. § 2705(b)(4).

i.      "Natural Resources" shall mean land, resident and anadromous fish, wildlife, biota, air, surface water (including sediments), wetlands, ground water, drinking water supplies, and all other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States.

j.      "Natural Resource Damages" shall mean damages for injury to, destruction of, loss of, or loss of use of Natural Resources, including the reasonable costs of assessing the damage, restoration costs, and the Reimbursable Costs (as defined in Paragraph 16), recoverable under OPA Section 1002(b)(2)(A), 33 U.S.C. § 2702(b)(2)(A).

k.      "Natural Resource Trustee" or "Trustee" shall mean DOI.

l.      "NRDAR Fund" means the DOI Natural Resource Damage Assessment and Restoration Fund, established pursuant to 43 U.S.C. §§ 1474b and 1474b-1.

m.      "Oil" shall mean any "oil" defined as such under CWA Section 311(a)(1), 33 U.S.C. § 1321(a)(1), and OPA Section 1001(23), 33 U.S.C. § 2701(23).

n.      "OPA" shall mean the Oil Pollution Act of 1990, as amended, 33 U.S.C. § 2701, *et seq.*

o.      "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper case letter.

p.      "Parties" shall mean the United States and the Defendant.

q.      "Plaintiff" shall mean the United States.

r.      "Discharge Incident" shall mean the August 10, 2008 pipeline rupture in Wayne County, Illinois, near Mount Erie, Illinois.

s.      "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

t.      "Site" or "Marathon Pipe Line Site" shall mean the area associated with the Discharge Incident.  The Site is generally depicted on the map attached as Appendix B to this Consent Decree.

u.      "State" shall mean the State of Illinois.

v.      "Subparagraph" shall mean a portion of this Consent Decree identified by a lower case letter or an Arabic number in parenthesis.

w.      "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

x.      "Work" shall mean all activities and obligations that Defendant is required to perform under this Consent Decree, as set forth in the Natural Resource Damages Assessment and Restoration Planning Report (attached hereto as Appendix A), which incorporates by reference an associated Wetland Mitigation Plan and Remedial Action Plan. The Work includes:  (i) Restoration of 7.1 acres of forested wetland; (ii) Restoration of 14.2 acres of agricultural fields; and (iii) Installation of bat houses and wood duck boxes.

## V.      GENERAL PROVISIONS

6.      Objectives of the Parties.  This Consent Decree provides the terms upon which the Parties agree to settle all claims of the Natural Resource Trustee against the Defendant, under applicable federal law, for certain Natural Resource Damages resulting from the Discharge Incident, as alleged in the Complaint.

7.      Obligations of the Defendant.  In settlement of the claims of the Natural Resource Trustee, the Defendant will perform those actions provided in Section VI below.

8.      Compliance with Applicable Law.  All activities undertaken by the Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations.

## VI.     PERFORMANCE OF RESTORATION PROJECT

9.      The Defendant shall finance and perform the Work in accordance with this Consent Decree and the DARP Report.  The DARP Report, including any amendments thereto, shall be fully enforceable under this Consent Decree.

10.      The Defendant shall commence performance of the Work no later than July 31, 2012, and shall perform the Work in accordance with the schedule set forth in the Restoration Projects Time Schedule, attached hereto and incorporated herein as Appendix C.

11.    Permits

a.    Where any portion of the Work requires a federal or state permit or approval, the Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.    The Defendant may seek relief under the provisions of Section IX (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval required for the Work.

c.    This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

12.    Supervising Contractor

a.    All aspects of the Work to be performed by the Defendant pursuant to Section VI (Performance of Restoration Project) of this Consent Decree shall be under the direction and supervision of the Defendant, in coordination with the Supervising Contractor. Defendant's selection of Arcadis U.S., Inc. as Supervising Contractor has been approved by the Trustee.

b.    If the Defendant proposes to change a Supervising Contractor, the Defendant shall give notice to the Trustee and must obtain an authorization to proceed from the Trustee before the new Supervising Contractor performs or directs any Work under this Consent Decree.

c.    If the Trustee disapproves of a proposed Supervising Contractor, the Trustee will notify the Defendant in writing and articulate its reasons for disapproval.  The Defendant shall then submit to the Trustee a list of contractors, including the qualifications of each contractor, that would be acceptable to the Defendant within 30 Days of receipt of the

- 10 -

Trustee's disapproval of the contractor previously proposed. The Trustee will provide written notice of the names of any contractors that it disapproves and an authorization to proceed with respect to any of the other contractors. The Defendant may select any contractor from that list that is not disapproved and shall notify the Trustee of the name of the Supervising Contractor selected within 21 Days of the Trustee's authorization to proceed.

      d.     If the Trustee fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents the Defendant from meeting one or more deadlines, the Defendant may seek relief under the provisions of Section IX (Force Majeure).

     13.     Project Manager. Within 30 Days of the Effective Date, the Defendant and the Trustee shall notify each other, in writing, of the name, address and telephone number of their respective designated Project Managers. If a Project Manager initially designated is changed, the identity of the successor will be given to the other Party in writing. The Defendant's Project Manager shall have the technical expertise sufficient to adequately oversee all aspects of the Work, and shall be subject to disapproval by the Trustee.

     14.     Completion of the Work.

      a.     Within 90 Days after the Defendant concludes that all Work has been fully performed, the Defendant shall schedule and conduct an inspection to be attended by the Defendant and the Trustee. If, after the inspection, the Defendant still believes that the Work has been fully performed, the Defendant shall submit to the Trustee a written report by a registered professional engineer stating that the Work has been completed in full satisfaction of the requirements of this Consent Decree. The report shall contain the following statement, signed by a responsible corporate official of the Defendant or the Defendant's Project Manager:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

      b.    If, after review of the written report the Trustee determines that any portion of the Work has not been completed in accordance with this Consent Decree, the Trustee will notify the Defendant in writing of the activities that must be undertaken by the Defendant pursuant to this Consent Decree to complete the Work, provided, however, that the Trustee may only require the Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the DARP Report (attached to this Consent Decree as Appendix A). The Trustee will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree. The Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution).

      c.    If the Trustee concludes, based on the initial or any subsequent report by Defendant that the Work has been performed in accordance with this Consent Decree, the Trustee will so notify the Defendant in writing.

15.    <u>Failure of Restoration Work</u>. Consistent with the requirements contained in Sections 4 and 4.1 of the DARP Report, the Defendant will conduct yearly compliance monitoring of the Work for a period of at least five years following all restoration plantings. In the event that compliance monitoring shows that satisfactory progress toward attainment of performance standards is not being made, Defendant will undertake the adaptive management measures listed in Section 4.1 of the DARP Report. If, after two successive years in which the

measures described in Section 4.1 of the DARP Report have been undertaken, some or all of the affected area has not yet achieved or made satisfactory progress toward performance standards, the Defendant and the Trustee will confer regarding an alternative remedy to address such areas where the Work has not adequately remedied the loss of Natural Resources. After Defendant and the Trustee confer in accordance with this Paragraph, Defendant will undertake agreed alternative restoration activities as appropriate, or, if no agreement between the Parties is reached, Defendant shall undertake the alternative remedy selected by the Trustee, subject to Defendant's right to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution).

## VII.   PAYMENTS BY THE DEFENDANT

16.    Payment of Reimbursable Costs by Defendant. Within 30 Days of the Effective Date, the Defendant shall pay a total of $90,629.03 to the United States for outstanding unreimbursed assessment costs and costs to be incurred for oversight and monitoring of Defendant's performance of the Work ("Reimbursable Costs"), as specified in this Paragraph. The Defendant shall pay the sum to the United States by certified or cashier's check in the amount due, payable to the "U.S. Department of Justice," referencing civil action number of this case and DOJ No.  90-5-1-1-10296, and delivered to the Financial Litigation Unit of the United States Attorney for the District of Southern Illinois. At the time of payment, Defendant shall send a copy of the check together with a transmittal letter, which shall state that the payment is for the reimbursable costs owed pursuant to the Consent Decree in *United States v. Marathon Pipe Line LLC*, and shall reference NRDAR Fund Account Number 14X5198 the "Marathon Oil Spill, Mount Erie, Illinois"; the civil action number, and DOJ case number 90-5-1-1-10296. A copy of the check and the transmittal letter shall be sent to:

U.S. Department of Justice:

USPS address:
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
Re:  DJ # 90-5-1-1-10296
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044

Courier Address:
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
DJ # 90-5-1-1-10296
U.S. Department of Justice
ENRD Mailroom, Rm. 2121
601 D Street, NW
Washington,, DC  20004

U.S. Department of the Interior:

Field Supervisor
United States Fish  and Wildlife Service
Rock Island Ecological Services Field Office
1511 47th Avenue
Moline, IL  61265

Steve Barcley
U.S. Department of the Interior
Office of the Solicitor
Three Parkway Center, Room 385
Pittsburgh, PA  15220

U.S. Department of the Interior
Natural Resource Damage Assessment and Restoration Program
Attn:  Restoration Fund Manager
1849 C Street NW, Mailstop 4449
Washington, DC  20240

17.     Non-Compliance with Payment Obligations.

a.      Interest on Late Payments.  In the event that any payment required by

Paragraph 16 is not made when due, the Defendant shall pay Interest on the unpaid balance

commencing on the payment due date and accruing through the date of full payment.

b.      Stipulated Penalties.  In addition to the Interest required to be paid under the preceding Subparagraph, if any payment required by Paragraph 16 is not made when due, the Defendant shall also pay as stipulated penalties $500.00 per late payment per Day through the date of full payment.

18.      Payment of Interest and Stipulated Penalties.  Any Interest payment under Subparagraph 17.a shall be paid in the same manner as the overdue principal amount, and shall be directed to the same fund or account as the overdue principal amount.

## VIII.  INDEMNIFICATION

19.      Defendant's Indemnification of the Trustee.

a.      The United States does not assume any liability by entering into this Consent Decree or by virtue of any activities to be performed by the Defendant under this Consent Decree.  The Defendant shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors or representatives for or from any and all claims or causes of actions arising from, or on account of, negligent or other wrongful acts or omissions of the Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree.  Further, the Defendant agrees to pay the United States all costs incurred including, but not limited to, attorney's fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of the Defendant, its officers, directors, employees, agents, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree.  The United States shall not be a party to any contract entered into by or on behalf of the Defendant in carrying out activities pursuant to this Consent Decree.

- 15 -

Neither the Defendant nor any contractor hired by the Defendant shall be considered an agent of the United States.

       b.     The United States shall give the Defendant notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with the Defendant prior to settling such claim.

     20.    The Defendant waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States arising from or on account of any contract, agreement or arrangement between the Defendant and any person for the performance of Work, including, but not limited to, claims on account of construction delays.  In addition, the Defendant shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement or arrangement between the Defendant and any person for performance of Work, including but not limited to, claims on account of construction delays.

## IX.    FORCE MAJEURE

     21.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure Event, the Defendant shall notify the Trustee, orally, within 96 hours of when the Defendant first knew or should have known that the event might cause a delay.  Within seven Days thereafter, the Defendant shall provide to the Trustee, a written explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the rationale for attributing such delay to a Force Majeure Event; and a statement as to whether, in the opinion of the Defendant, such event may

cause or contribute to an endangerment to public health, welfare or the environment.  The Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a Force Majeure Event.  Failure to comply with the above requirements shall preclude the Defendant from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such delay.  The Defendant shall be deemed to have notice of any circumstances of which its contractors or subcontractors had or should have had notice.

22.     If the Trustee agrees that the delay or anticipated delay is attributable to a Force Majeure Event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure Event will be extended by the Trustee for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure Event shall not, of itself, extend the time for performance of any other obligation.  If the Trustee does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure Event, the Defendant will be notified of that decision in writing by the Trustee.  If the Trustee agrees that the delay is attributable to a Force Majeure Event, the Trustee will notify the Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure Event.

23.     If the Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 Days after receipt of the Trustee's notice.  In any such proceeding, the Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure Event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the

effects of the delay, and that the Defendant complied with the requirements of Paragraphs 21 and 22 above. If the Defendant carries this burden, the delay at issue shall be deemed not to be a violation by the Defendant of the affected obligation of this Consent Decree as identified by the Trustee and the Court.

## X.    DISPUTE RESOLUTION

24.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedure of this Section shall be the exclusive mechanism to resolve disputes arising under this Consent Decree and its Appendices. The procedures set forth in this Section shall not apply to actions by the Trustee to enforce the Defendant's obligations that have not been disputed in accordance with this Section.

25.    Informal Dispute Resolution. Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties to the dispute. Informal negotiations cannot exceed 20 Days from the time a dispute arises, unless modified by written agreement of the Parties to the dispute. A dispute is considered to have arisen when one Party sends the other Party a written Notice of Dispute.

26.    Formal Dispute Resolution.

a.    In the event that the parties cannot resolve a dispute by informal negotiations under the preceding paragraph, then the position advanced by the Trustee shall be considered binding unless, within 14 Days after the conclusion of the informal negotiations period, the Defendant invokes the formal dispute resolution procedures of this Section by serving on the Trustee a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon.

- 18 -

b.        Within 30 Days after receipt of Defendant's Statement of Position, the Trustee will serve on the Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by the Trustee.  Within ten Days after receipt of the Trustee's Statement of Position, the Defendant may submit a Reply.

c.        Following receipt of Defendant's Statement of Position submitted pursuant to subparagraph (a) and after service of the Trustee's Statement of Position and any Reply, the Regional Director for U.S. Fish and Wildlife Service will issue a final decision resolving the dispute.  The Regional Director's decision shall be binding on the Defendant unless, within 20 days of receipt of the decision, the Defendant files with the Court and serves on the Trustee a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree.  The Trustee may file a response to the Defendant's motion.

d.        Judicial review of any decision of the Regional Director governed by this Paragraph shall be limited to the assembled administrative record of the dispute, which shall include the statements of position of the Parties and the accompanying supporting documentation.

27.        The invocation of formal dispute resolution procedures under this Section shall not extend, postpone or affect in any way any obligations of the Defendant under this Consent Decree not directly in dispute, unless the Trustee or the Court determines otherwise.

## XI.   STIPULATED PENALTIES

28.        The Defendant shall pay stipulated penalties to the United States for each failure to comply with the firm dates listed on Appendix C unless excused under Section IX (Force

Majeure). Any stipulated penalties paid pursuant to this Section shall be in addition to the payments required pursuant to Section VII (Payments by the Defendant), Paragraph 16. The Defendant shall pay the following total amounts per day for each day of violation:

| Period of Failure to Comply | Penalties Per Violation Per Day |
|---|---|
| 1st through 14th Day | $750.00 |
| 15th through 44th Day | $1,200.00 |
| 45th Day and beyond | $3,000.00 |

29.     All stipulated penalties shall be due and payable within 30 Days of the Defendant's receipt from Trustee of a demand for payment of the stipulated penalties. Stipulated penalties shall be paid in the manner identified in Paragraph 16.

30.     All stipulated penalties shall begin to accrue on the Day after complete performance is due or the day a violation of the Consent Decree occurs, and shall continue to accrue through the final day of the correction of the non-compliance, however stipulated penalties need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of the Regional Director of U.S. Fish and Wildlife Service that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of the Regional Director's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's order, except as provided in subparagraph c, below.

c.      If any Party appeals the district court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

31.     . Nothing herein shall preclude the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.  If the Trustee determines that the Defendant has failed to comply with a requirement of this Consent Decree, the Trustee will notify the Defendant and describe the noncompliance.  However, stipulated penalties shall accrue as provided in Paragraph 30 regardless of whether the Defendant has been notified of the violation.

## XII.    COVENANTS AND RESERVATION OF RIGHTS BY PLAINTIFF

32.     Covenants by the United States.  In consideration of the actions that will be performed and the payment that will be made by the Defendant under this Consent Decree, and except as specifically provided by Paragraph 33 (General Reservation of Rights) and Paragraph 34 (Special Reservation of Rights for Unknown Conditions and New Information), the United States covenants not to sue or take administrative action against the Defendant pursuant to OPA Section 1017(b), 33 U.S.C. § 2717(b), for Natural Resource Damages that have resulted from the Discharge Incident.  These covenants not to sue are conditioned upon the complete and satisfactory performance by the Defendant of its obligations under Sections VI and VII of this Consent Decree.  These covenants not to sue extend only to the Defendant and do not extend to any other person.

33.     General Reservation of Rights.

a.      The covenants not to sue set forth above do not pertain to any matters other than those expressly specified in Paragraph 32.  The United States reserves and this

Consent Decree is without prejudice to, all rights against the Defendant with respect to all other matters, including but not limited to the following:

      i.      Claims based on a failure by Defendant to meet a requirement of this Consent Decree;

      ii.      Liability for any removal costs under OPA section 1002(b)(1), 33 U.S.C. § 2702(b)(1);

      iii.      Claims based on rights subrogated to the Oil Spill Liability Trust Fund under OPA Section 1015, 33 U.S.C. § 2715, for any amounts paid or to be paid by the Oil Spill Liability Trust Fund to any person for removal costs or damages in connection with any past, present, or future discharge, or substantial threat of discharge, of Oil at or from the Site;

      iv.      Liability for any other costs relating to the Discharge Incident incurred or to be incurred by the United States that are not within the definition of Natural Resource Damages;

      v.      Liability for any corrective action, response activity, response costs, or any other cleanup or regulatory action (not including claims for Natural Resource Damages) at the site pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992k, the Clean Water Act, 33 U.S.C. §§ 1251-1387, or any other applicable federal law as a result of the release or threatened release of any hazardous substance or discharge of Oil at or from the Site;

      vi.      Liability arising from the past, present or future disposal, release, or threat of release of hazardous substances or discharges of Oil anywhere other than at or from the Site;

vii.     Liability for damages for injury to, destruction of, or loss of Natural Resources resulting from releases or threatened releases of hazardous substances or discharges of Oil other than during the Discharge Incident;

viii.     Liability arising from any future disposal, release or threat of release of hazardous substances or discharges of Oil at or from the Site after the date of lodging of this Consent Decree; and

ix.     Criminal liability.

34.     <u>Special Reservation of Rights for Unknown Conditions and New Information.</u>
Notwithstanding any other provision of this Consent Decree, the United States reserves the right to institute proceedings against the Defendant in this action or in a new action seeking recovery of Natural Resource Damages, including costs of damages assessment, based on (i) conditions caused by the Discharge Incident, unknown to the Trustee as of the date of lodging of this Consent Decree, that result in the discharge of Oil that contributes to injury to, destruction of, or loss of Natural Resources; or (ii) information received by the Trustee after the date of lodging of the Consent Decree that indicates that the Discharge Incident has resulted in injury to, destruction of, or loss of Natural Resources of a type or future persistence that was unknown to the Trustee as of the date of lodging of this Consent Decree.

35.     <u>Rights of Non-parties.</u>  Nothing in this Consent Decree is intended as a covenant not to sue or a release from liability for any persons or entities not parties to this Consent Decree. The United States expressly reserves all claims, demands, and causes of action, either judicial or administrative, past or future, in law or equity, against all such persons and entities.

## XIII.   COVENANT BY THE DEFENDANT

36.     The Defendant hereby covenants not to sue and agrees not to assert any claims or causes of action against the United States, the Oil Spill Liability Trust Fund, or their agents, employees or contractors, with respect to Natural Resource Damages or this Consent Decree, including, but not limited to assertion or presentment of any claim under OPA Section 1009, 33 U.S.C. § 2709, for Natural Resource Damages arising from the Discharge Incident or the discharge of Oil and/or from the Site.

## XIV.   EFFECT OF SETTLEMENT

37.     Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law.

38.     Nothing in this Consent Decree shall be construed to alter or amend the ongoing responsibilities and obligations that exist pursuant to the contract between William and Liese Ricketts and the United States Department of Agriculture ("USDA") under the USDA Conservation Reserve Program.

39.     Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Discharge Incident and/or Site against any person not a Party hereto.

40.     Waiver of Claim Splitting Defenses.  In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Discharge Incident and/or the Site, which is premised on

any reservation of rights set forth in Paragraph 33 (General Reservations of Rights) or Paragraph 34 (Special Reservation of Rights for Unknown Conditions and New Information), the Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; *provided, however,* that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Paragraph 32 (Covenants by the United States).

## XV.    NOTICES AND SUBMISSIONS

41.    Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or any other document is required to be sent by one Party to another, it shall be directed to individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.

As to the United States:

U.S. Department of Justice:

USPS address:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
Re:  DJ # 90-5-1-1-10296
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044

Courier Address:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
DJ # 90-5-1-1-10296

U.S. Department of Justice
ENRD Mailroom, Rm. 2121
601 D Street, NW
Washington,, DC  20004

U.S. Department of the Interior:

Tom Melius
Regional Director
U.S. Fish and Wildlife Service
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN  55111

And

Steve Barcley
U.S. Department of the Interior
Office of the Solicitor
Three Parkway Center, Room 385
Pittsburgh, PA  15220

As to Defendant:

Mark Ehrman
Marathon Petroleum Company LP
5000 W. 86th Street
Indianapolis, IN  46268-1601

Group Counsel – Health, Environmental, Safety & Security
Marathon Petroleum Company LP
539 South Main Street
Findlay, OH  45840

## XVI.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

42.     This Consent Decree shall be lodged with the Court for a period of at least 30

Days for public notice and comment.  The United States reserves, and the Defendant

acknowledges, the United States' right to withdraw or withhold its consent if the comments

regarding the Consent Decree disclose facts or considerations, which indicate that this Consent

Decree is inappropriate, improper, or inadequate.

43.     The Parties agree that the Defendant shall not be required to file an Answer to the Complaint unless or until 30 Days after: (i) the United States has informed the Defendant in writing that it has withdrawn its consent to this Consent Decree; or (ii) the Court has denied the United States' motion to enter the Consent Decree.

44.     If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XVII.  EFFECTIVE DATE AND RETENTION OF JURISDICTION

45.     The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

46.     This Court shall retain jurisdiction to modify and enforce the terms and conditions of this Consent Decree and to resolve disputes in accordance with Section X (Dispute Resolution) hereof.

## XVIII. CONSENT DECREE MODIFICATIONS

47.     Any material modifications to the Consent Decree may be made only by agreement of the Parties, in writing, and shall not take effect unless approved by the Court.  Any non-material modification of this Consent Decree shall be made by agreement of the Parties, in writing, and shall not take effect until filed with the Court.  Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

48.     The provisions of this Consent Decree are not severable.  The Parties' consent hereto is conditioned upon entry of the Consent Decree in its entirety without modification, addition, or deletion except as agreed to by the Parties.

49.    Economic hardship or changed financial circumstances of the Defendant shall not serve as a basis for modifications of this Consent Decree.

## XIX.    APPENDICES

50.    The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the DARP Report, dated November 2010, revised March 2011 and revised August 2011.

"Appendix B" is the Map of the Marathon Pipe Line Site.

"Appendix C" is the Restoration Projects Time Schedule.

## XX.    SIGNATORIES/SERVICES

51.    The undersigned representatives of the Parties each certify that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such party to this document.

52.    The Defendant consents to the entry of this Consent Decree without further notice. The Defendant hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified the Defendant in writing that it no longer supports entry of the Consent Decree.

53.    The Defendant shall identify, on the attached signature page, the name, address and telephone number of an agent who is authorized to accept service of process by mail on behalf of the Defendant with respect to all matters arising under or relating to this Consent Decree. The Defendant hereby agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XXI.   FINAL JUDGMENT

54.     This Consent Decree and its appendices constitute the final, complete and exclusive agreement and understanding between the Parties with respect to the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.

55.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States and the Defendant.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED.

Dated this 15th day of February, 2012

UNITED STATES DISTRICT JUDGE
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Marathon Pipe Line LLC* (S.D. Ill.) relating to Natural Resource Damages at the Marathon Pipe Line Site.

FOR THE UNITED STATES OF AMERICA

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Date: 12/19/2011

W. BENJAMIN FISHEROW
Acting Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611

Date: 12/19/2011

NIGEL B. COONEY
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Tel:  202-514-3145
nigel.cooney@usdoj.gov

OF COUNSEL:

STEVE BARCLEY
U.S. Department of the Interior
Office of the Solicitor
Three Parkway Center, Room 385
Pittsburgh, PA  15220
Tel:  412-937-4007
steve.barcley@sol.doi.gov

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Marathon Pipe Line LLC* (S.D. Ill.) relating to Natural Resource Damages at the Marathon Pipe Line Site.

FOR MARATHON PIPE LINE LLC



Craig Q. Pierson, President
Marathon Pipe Line LLC
539 South Main Street
Findlay, Ohio 45840

If different from above, the following is the name and address for the Settling Defendant's agent for service and the name and address of the Settling Defendant's counsel.  Counsel may act as agent for service.

| Agent for Service | Attorney |
|---|---|
| Group Counsel – | Sherry L. Hesselbein, Esq. |
| Health, Environmental, Safety & Security | Marathon Petroleum Company LP |
| Marathon Petroleum Company LP | 539 South Main Street |
| 539 South Main Street | Findlay, Ohio 45840 |
| Findlay, Ohio  45840 | Tel: 419-421-4616 |
| | shesselbein@marathonpetroleum.com |

Appendix A
to

Consent Decree in the matter of *United States v. Marathon Pipe Line LLC* (S.D. Ill.)
relating to Natural Resource Damages at the Marathon Pipe Line Site.

Imagine the result

# Natural Resource Damages Assessment and Restoration Planning (DARP) Report

Marathon Pipe Line LLC
MT. ERIE PIPE LINE RELEASE
NEAR ALBION, WAYNE COUNTY, ILLINOIS

November 2010

Revised March 2011

Revised August 2011 (Section 7. only)



*Infrastructure, environment, facilities*

**ARCADIS**

_Jason R. Cosgrove_

Jason Cosgrove, PE
Senior Engineer / Project Manager

_Douglas Partridge_

Douglas Partridge MS, PWS, CE
Senior Ecologist

_Matthew Butcher_

Matthew Butcher
Principal Scientist

**Natural Resource Damages
Assessment and Restoration
Planning (DARP) Report**

Mt. Erie Pipe Line Release
Project

Prepared for:
Marathon Pipe Line LLC

Prepared by:
ARCADIS U.S., Inc.
251 East Ohio Street, Suite 800
Indianapolis, IN 46204
Telephone 317.231.6500
Fax 317.231.6514

Date:
17 November 2010

Revised March 2011

Revised August 2011
(Section 7. (single paragraph only))

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 1 of 26

| | | |
|---|---|---|
| **1.** | **Introduction** | **3** |
| | 1.1    Event History | 3 |
| | 1.2    Site Description | 4 |
| | 1.3    Natural Resource Damages | 6 |
| **2.** | **Injury Assessment** | **6** |
| | 2.1    Endangered Species | 6 |
| | 2.2    Waters of the U.S., including Wetlands | 8 |
| | 2.3    Aquatic and Aquatic-Dependent Communities | 9 |
| **3.** | **Restoration Planning** | **10** |
| | 3.1    Primary Restoration | 12 |
| | 3.2    Compensatory Restoration | 12 |
| | 3.3    Compensatory Project Scaling | 16 |
| | 3.4    Compensatory Projects Effects | 18 |
| **4.** | **Compliance Monitoring and Adaptive Management Plan** | **19** |
| | 4.1    Adaptive Management | 21 |
| | 4.1.1    Bat House Maintenance | 22 |
| | 4.1.2    Wood Duck Box Maintenance | 22 |
| **5.** | **Past and Future Involvement of Responsible Party** | **22** |
| **6.** | **Agencies Contacted** | **23** |
| **7.** | **Public Review and Comment** | **24** |
| **8.** | **References** | **25** |

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 2 of 26

**Figures**

1. Site Location Map, Mt. Erie Pipe Line Release, Mt. Erie, Wayne County, Illinois.

2. Immediate Response Activities as of 9/18/08, Mt. Erie Pipe Line Release, Mt. Erie, Wayne County, Illinois.

3. Marathon Parcel Map Per Property Boundary Survey, Mt. Erie Pipe Line Release, Mt. Erie, Wayne County, Illinois.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 3 of 26

# 1.  Introduction

This document describes the activities related to natural resource damages (NRD)
associated with the release of crude oil in August 2008 from a pipe line owned and
operated by Marathon Pipe Line LLC (MPL). It describes the nature of the event, the
effects and potential effects of the event on the natural resources of the area, and the
planned activities to rehabilitate the injured natural resources back to the condition that
existed prior to the discharge of oil, and to compensate the public for the interim lost
use of natural resources during the recovery period.

## 1.1 Event History

In the morning hours of August 10, 2008, a sudden pressure drop was noted on a 20-
inch diameter pipe line owned and operated by MPL. The pipe line transports crude oil
(oil) from Patoka, Illinois, to Owensboro, Kentucky (Figure 1). The pipe line was shut
down immediately as pressure sensors noted the pressure drop. Reconnaissance
noted a pipe line rupture adjacent to a remote section of gravel road in a predominantly
agricultural area south of the towns of Mt. Erie and north of Golden Gate, Wayne
County, Illinois. The pipe line release occurred between MPL pumping stations located
approximately 10 miles to the northwest and 8 miles to the southeast. The pipe line is
buried approximately 5 feet below ground surface at the release location. It has been
estimated that approximately 5,000 barrels of oil were released during the pipe line
break. Over 3,260 barrels of crude oil have been recovered from the Site (through
direct recovery, estimated evaporation, and estimated quantity contained within directly
removed soils). To-date, over 6,000 tons of soil has been disposed off-site.

Immediately after the pipe line release, oil exited the ground and sprayed an area of
foliage and trees immediately to the southwest of the pipe line rupture. Oil also flowed
over the ground surface in the immediate vicinity of the release. In addition to the oil
"spray" and surface flow of oil, oil migrated through the subsurface soil due to the
pressure of the pipe line (i.e., pipe line pressure at the time of release was estimated to
be 200 pounds per square inch (psi)).

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 4 of 26

The overland oil flow traversed east approximately 70 to 100 feet into a forested area
and oil then flowed south to the pipe line right-of-way (ROW).  An additional overland
flow pathway of oil flowed southward from the ROW about 430 feet and stopped.  At
the ROW, oil flowed in a southeasterly direction, and pooled behind a slight hill in the
ROW, resulting in backflow of oil northward approximately 100 ft in a narrow,
seasonally dry swale.  Once the pool in the ROW was large enough, the oil flow
extended south of the ROW into forested woodlands. The oil flowed northward out of
the forested area back to the ROW, and continued to migrate along the ROW to the
southeast until it reached a drainage swale which directed the flow southward at the
eastern edge of the woods.  The oil flowed southward along a seasonally dry drainage
swale to open surface water.  Upon reaching the open water, the oil formed a layer on
the water surface, and migrated down seasonally dry meandering creek beds and low
flow capacity streams (i.e., the abandoned Elm Creek Channel).  The oil was largely
contained within the creek banks.  The extent of spread of released oil is identified on
Figure 2.

MPL responded immediately to the release and completed extensive emergency
response and mitigation activities at the Site.  Those response activities included over
250 personnel with operations 24 hours a day, 7 days a week.  Details and
approximate locations of immediate response remedial activities are summarized on
Figure 2.

MPL has purchased property from both Robert E. and Janice K. Anniss (53 acres) and
William E. and Liese Ricketts (104 acres) which contains the Site, affected lands, and
adjacent lands (Figure 3).

**1.2  Site Description**

The overall project area is located in a sparsely occupied, unincorporated area of
Wayne County, Illinois.  Historic and current land use in the vicinity of the spill is rural
with a history of ranching, farming, and oil and gas exploration and production.  The
immediate project site, or identified release area, generally includes lands proximate to
the existing pipeline corridor, south of County Road 5 and west of County Road 3.  As
noted above, there were two private parcels known to be affected by the release. MPL

now owns approximately 157 acres that encompasses the area(s) immediately surrounding the pipe line release.

There is an extensive palustrine forested wetland extending southward from the release area. This wetland area is part of the Elm Creek and Little Wabash River floodplain. The former channel of the Elm River[1] lies within the property, and it serves to create ponds and oxbows which provide habitat for a variety of wildlife species. The Little Wabash River flows in a southerly direction, south of the immediate project site. The forested wetland is a mixture of deciduous hardwoods characteristic of floodplain habitats. Common trees include: green ash (*Fraxinus pennsylvanica*), silver maple(*Acer saccharinum*), black willow (*Salix nigra*), swamp white oak(*Quercus bicolor*), hackberry (*Celtis laevigata*), American elm (*Ulmus americana*), black walnut (*Juglans nigra*), shagbark hickory (*Carya ovata*), *Crataegous* species, and bitternut hickory (*Carya cordiformis*). Common understory species include buttonbush (*Cephalanthus occidentalis*), Poison ivy *(Toxicodendron radicans)*, trumpet creeper (*Campsis radicans*), and marsh seedbox (*Ludwigia palustris*).

Through its significant habitat structure and contiguity, the large palustrine forest complex in the area of the release site provides habitat for a variety of wildlife species. Wildlife species observed at the Site – or likely to occur at or near the Site – include mammals, birds, snakes and amphibians, and aquatic life.

A portion of the project site in the immediate vicinity of the pipe line release is bounded by an existing Conservation Reserve Program (CRP) contract.

A further description of site conditions can be referenced in the *Wetland Delineation Report* (ARCADIS, September 2010) and *Wetland Mitigation Plan* (ARCADIS, March 2011).

---

[1] The Elm River was redirected to a channelized drainage ditch located west of the Site prior to 1930 which is the earliest historical mapping identified for the site. Representatives of local and state National Resource Conservation Service and local drainage ditch committee could not provide a general date of construction of the ditch.

Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report

Mt. Erie Pipe Line Release
Project
Page 6 of 26

### 1.3  Natural Resource Damages

The NRD resulting from the release of crude oil is regulated under the Oil Pollution Act of 1990, which defines the natural resources as those held "in trust" for the public.  The trustees for the natural resources include certain federal and state agencies defined by the Oil Pollution Act of 1990 and Native American nations or tribes affected by the damages.  For this event, the trustee has been designated as the United States Fish & Wildlife Services (USFWS).  The Illinois Environmental Protection Agency (IEPA) and Illinois Department of Natural Resources (IDNR) are involved in the capacities of remedial investigation manager (IEPA) and technical adviser for natural resource concerns (IDNR).

Natural resources are defined by the regulations to include:

- The environment: land, surface water, groundwater, and air

- Fish, wildlife, vegetation or other living things

NRD assessment (NRDA) is the process of determining the kind and scale of restoration.  This document summarizes the NRDA process for this event.  The draft Restoration Plan is subject to a public review period.

## 2.  Injury Assessment

The injury assessment phase of the NRD process identifies the natural resources potentially present and estimates the potential injuries to those resources.  Descriptions of natural resources occurring, or potentially occurring, in the vicinity of the Site and their potential injuries are provided below.

### 2.1  Endangered Species

Given the geographic location and available habitats, a federally endangered species, the Indiana Bat (*Myotis sodalis*), could inhabit the Site.  In wooded areas, the Indiana Bat may roost under the loose tree bark on dead or dying trees.  Roost trees typically are within canopy gaps or along wooded edges. Habitats in which maternity roosts

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 7 of 26

occur include riparian zones, bottomland and floodplain habitats, wooded wetlands, and upland communities. Indiana bats tend to forage in semi-open to closed forested habitats with an open understory, forest edges, and riparian areas.

Indiana bats are found throughout most of the eastern half of the United States. Approximately half of the known population of all Indiana bats hibernates in the southern half of Indiana; Illinois has an estimated population of 43,000 Indiana Bats. Actual surveys for the endangered Indiana bat were not performed at the Site, but based on the presence of suitable habitat, the Indiana bat may be present (*Biological Assessment Report, Endangered Species – Indiana Bat*, ARCADIS, December 2009). The Missouri Department of Conservation (MDC, *Best Management Practices*, June 2000) states that Indiana bats prefer live shagbark hickory (*Carya ovata*) and large (live or dead) white oak (*Quercus alba*) trees for maternal roost sites. Of all trees removed from the Site during the release response, only 19 trees of these preferred species were removed. This loss of potential habitat (roosting trees and foraging areas) represents a relatively small fraction of the total wooded wetlands available in the vicinity of the release.

The total size of suitable habitat for the Indiana bat around the action area was determined to be approximately 233 acres; of that area, a total area of 10.3 acres was cleared of its trees. The extent of modification to summer habitat for the Indiana Bat does not represent an appreciable change to the quality of summer habitat in the vicinity of the release, as the modification (tree clearing) was limited to the narrow linear features of access roads installed and enhanced at the Site, on a limited scale. This modification is similar in nature to, and may not represent a substantially greater extent than, the tree mortality related to the natural variation of the flooding regime in the vicinity of the Site. Finally, alternative suitable habitat for summer roost habitat is available elsewhere on the Site and nearby, where the timber stand contains old growth individuals of the preferred tree species. In the *Biological Opinion* prepared by USFWS (2010) pursuant to this issue, USFWS determined the following:

> "*We conclude that bats including the federally listed endangered Indiana bat may have been incidentally harassed or harmed by the otherwise authorized tree removal activities for the emergency response. However, based on the best available information, the take of the Indiana bats by the response actions when*

Case 3:11-cv-01123-DRH-SCW   Document 9   Filed 02/22/12   Page 42 of 66   Page ID #134

Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report

Mt. Erie Pipe Line Release
Project
Page 8 of 26

*added to the reduced fitness or survival due to the environmental baseline
conditions will not cause a detectable negative effect in reproduction or recruitment
of the species in this region. The harassment or harm if present was near the end
of the summer season which is past the birth and immature care phases of the
reproductive cycle so the young bats were volant (capable of flight and caring for
self). The loss of a primary maternity roost tree is not unique in that forest
succession and storms may also cause the loss of roost trees. "*

Restoration planning and implementation will incorporate measures that avoid any
adverse effects to the endangered bats that may be present at the site.

## 2.2  Waters of the U.S., including Wetlands

Waters of the United States, including Wetlands (waters/wetlands) were delineated by
ARCADIS using methods outlined in the 1987 USACE *Wetlands Delineation Manual*
(Environmental Laboratory, 1987) (hereafter, 1987 Manual) and 2008 *Draft Interim
Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Midwest
Region* (USACE, 2008) (hereafter, 2008 Regional Supplement). Field work was
performed on September 10 and 11, 2008 with additional data collection on July 15
and 16, 2010. In addition to the wetland delineation, ARCADIS delineated boundaries
of all impacted areas within wetlands.

Impacts to waters/wetlands have been divided into three functional categories: oil
spill/staining remediation; placement of fill in waters/wetlands; and vegetation clearing
in waters/wetlands. The impacts may be summarized as follows:

- **Oil spill/staining remediation:** The areas of this remediation were in lower
  elevations of the Site, predominantly within the "historical" channel for the Elm
  River. Remedial activities included flushing of surface oils and some shallow
  surface scraping of the channel bed and banks. The pre-construction course,
  condition, capacity, and location of open waters was maintained and/or
  restored throughout these impacted areas.

- **Structural fill:** Roads were constructed or improved; two interceptor trenches
  were constructed; a variety of structures – berms, dams, bridges, siphon
  dams, etc – were constructed throughout the Site.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 9 of 26

- **Tree clearing:** To allow access for response and remedial activities, selected trees were cleared in locations throughout the Site.

## 2.3  Aquatic and Aquatic-Dependent Communities

Portions of the Site lie within the floodplain of the Elm River.  These areas contain several ponds, or sloughs, which are periodically flooded.  This habitat is presumed to not support substantial fish communities, but would support benthic macroinvertebrates, aquatic vegetation, and aquatic-dependent wildlife.  The USFWS requested that the benthic macroinvertebrate community[2] of the aquatic habitats associated with the Site be evaluated for potential injuries to the natural resources, resulting from the release, with the intent to provide information for the injury assessment and restoration selection process.

Sampling locations and methods were selected by ARCADIS (on behalf of MPL) and the trustee in a cooperative process.  A total of 10 locations were collected in Site locations and nearby reference areas, with five locations in each.  Co-located sediment samples were collected and analyzed for the constituents of concern related to the pipe line release.

One sampling location within the Site had macroinvertebrate data that suggested the benthic community may be degraded.  The sediment sample from this location also had the most reported detections and highest concentrations of the constituents of concern, and was the only Site location during this sampling event whose sample concentrations exceeded the criteria of concern.   The physical habitat at this location was also the most modified, and structurally simplified, of all sampling locations, partially as a result of activities conducted during the recovery and remediation following the release.

---

[2] Here, the phrase "benthic macroinvertebrates" refers to all aquatic and semiaquatic macroinvertebrates that may be collected within an aquatic habitat.  It includes those macroinvertebrates that occupy the sediment surface, are within the sediment, on submerged structure, on vegetation, or free-swimming.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 10 of 26

Several additional aquatic-dependent wildlife, specifically several turtles and two ducks, were lost as a result of oiling.

### 3.   Restoration Planning

Two kinds of restoration are recognized in the NRD process:

- Primary restoration – restoration to return the natural resources and the services they provide to the kind and level present before the release.

- Compensatory restoration – restoration to compensate for the services temporarily lost before the affected natural resources are restored to their full function.

Primary restoration activities were initiated shortly after the release, and are ongoing. These have been described in detail in documents associated with the response and remediation activities proposed at the Site and will be summarized below.

Several compensatory restoration options were considered in the NRDA process, including a variety of planting options and excavation of the oxbow channels on the site to create deeper water habitat.  Proposed compensatory restoration activities are detailed in a *Wetlands Mitigation Plan* (ARCADIS 2011).

To achieve proposed functional lift, the following is proposed in the *Wetlands Mitigation Plan*: (1) restoration of 7.1 acres of impacted palustrine forested wetlands on-site, (2) restoration of 14.2 acres of adjacent agricultural fields; and (3) installation of bat houses and wood duck boxes.  Respective to the Nationwide Permit, the proposed mitigation is intended to account for all temporary impacts to palustrine forested wetland habitat and reflects a 3:1 mitigation ratio.  Respective to formal consultation with USFWS relative to impacts to faunal populations, installed habitat features are intended to enhance habitat for the Indiana bat and wood duck. Additionally, and outside the scope of the intended mitigation plan, an area of 7.9 acres (initially cleared in the Conservation Resource Program area during immediate response activities) will be restored, subsequent to completion of bioremediation activities.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 11 of 26

Remediation plans pertaining to impacted media have been assembled in a
*Remediation Action Plan* (RAP).  Surface soil, subsurface soil, sediment, and shallow
groundwater media investigation, characterization, and monitoring have been
conducted under the auspices of the IEPA and INDR.  Following is a summary of RAP-
proposed activities:

- Soils in the immediate vicinity of surface soil sample SS-03 (located just to the
  south of the pipe line point of release) will be remediated (via excavation and off-
  site disposal) in order to remove potential residential soil inhalation risk.

- Surficial soils (in the vicinity of the vegetation-disturbed Conservation Resource
  Program area of the site) will be incorporated into an enhanced bioremediation
  treatment zone/area.

- Institutional controls have been incorporated in the remedial action, as described
  in the RAP.  Marathon has recorded an Environmental Land Use Control (ELUC)
  with Wayne County that incorporates into the remedial action a construction
  worker caution zone covering the entire remediation site and a groundwater use
  prohibition.  Workers who disturb soil within the construction worker zone during
  excavation or other activities will be notified of the potential presence of impacts
  and will be required to use appropriate personal protective equipment (PPE).
  The groundwater use restriction will prohibits use of groundwater at the site for
  potable purposes and will address the groundwater ingestion and soil
  component to groundwater ingestion risks.

- A Declaration of Restrictive Covenant for Conservation has been recorded for
  the site with Wayne County (per the USACE).

- A construction worker caution notification will be attached to the deed of the
  property in the recording of a No Further Remediation (NFR) Letter with the
  county.  The construction worker caution notification will address potential
  construction worker soil inhalation risks presented by site soils.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 12 of 26

- Monthly free product recovery activities will be conducted on monitoring well MW-7 (located just to the south of the pipe line's point of release) until free product has not been observed in the well for three consecutive months.

## 3.1  Primary Restoration

Primary restoration activities include:

- Removal of structural fill

- Tree planting, to offset losses incurred by clearing and other activities during the response phase and remediation activities

- Restoration of wetlands impacted by the oil release and response phase and remediation activities

The planned efforts will result in the restoration of habitats and services present at the Site to near pre- release conditions.  Tree planting will be of sufficient density to achieve nearly pre-release conditions (once the trees mature).  A total of 7.1 acres will be subject to the primary restoration.  In addition, over an acre will be included in primary restoration related to implementation of the *Remedial Action Plan* (ARCADIS 2011) – outlined activities.

## 3.2  Compensatory Restoration

Three main elements of potential compensatory restoration have been identified in discussions with the trustee.  MPL currently plans to initiate projects for these restoration opportunities.  They are:

- Installing and maintaining two steel, seven chambered, artificial bat houses and planting trees to provide habitat for the Indiana Bat;

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 13 of 26

- Installing and maintaining ten wood duck nesting boxes to increase local productivity of the wood duck[3]; and

- Restoring a palustrine forested wetland in the existing agricultural field to the east of the project site to create additional wetland habitat.

The primary objective of the Mt. Erie palustrine forested wetland restoration is the enhancement of ecosystem functioning associated with the large on-site wetland complex. This enhancement mitigates for unavoidable impacts to waters/wetlands that resulted from remedial activities and compensates the public for the interim lost use of natural resources during the recovery period. To achieve the proposed lift in wetlands function, MPL has proposed restoration of 14.2 acres of adjacent agricultural fields.

These projects will account for all temporary impacts to palustrine forested wetland habitat. In addition, MPL will work with the *Natural Resources Conservation Service* to address the restoration of an area (7.9 acres) of the Site, cleared during response activities, which is currently held as CRP lands.

Based on project discussions among all parties, the agricultural field adjacent to the east edge of the Site was selected as an appropriate mitigation area to account for impacts, including natural resource damages, to the wetland ecosystem and other natural resources resulting from the pipe line release, response and remedial activities, and subsequent damages and losses of natural resources services. This site was selected because it is owned by MPL, provides an appropriate on-site mitigation option which provides resource-to-resource compensatory restoration, and will significantly increase ecosystem functioning to the Elm River floodplain ecosystem.[4] The

---

[3] Additional details as they relate to proposed artificial bat houses and wood duck boxes are contained within the *Wetlands Mitigation Plan* (ARCADIS 2011).

[4] A 1999 USACE publication (*Case Study: Application of the HGM Western Kentucky Low-Gradient Riverine Guidebook to Monitoring Wetland Development*) which evaluated rates of restored ecosystem functioning in previous agricultural fields demonstrated that the restoration of a agricultural field to low-gradient riverine/floodplain wetlands had dramatic functional results in a

Case 3:11-cv-01123-DRH-SCW   Document 9   Filed 02/22/12   Page 48 of 66   Page ID #140

Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report

Mt. Erie Pipe Line Release
Project
Page 14 of 26

restoration site boundary follows the elevation of the 5 percent daily exceedance flow events estimated for the Site based upon available mapping and site observations.

Consistent with USACE requirements for the restoration project, trees will be planted at a density of:

- 60 stems/acre, if utilizing RPM[5] nursery trees (minimum 3-gallon container and 30 inch tall), or

- 450 stems/acre, if utilizing bare root seedlings (minimum 30 inches tall).

It is anticipated that RPM nursery trees will be utilized for this project. Only hard mast species (i.e., oak and hickory species) will be planted. They are highly valuable to aquatic-dependent wildlife and are a requirement of USACE. The planted areas will also be seeded with a native floodplain seed mix. Depending on water levels (and site accessibility), planting is tentatively scheduled for late spring / early summer 2011. The restoration plan design is provided in the *Wetland Mitigation Plan* and may be summarized as follows:

1.   Site preparation. Establish a plant staging area, and installation of any necessary sediment and erosion control measures.

2.   Clearing of vegetation necessary to facilitate removal of fill and/or structures.

3.   Removal of all temporary fill materials and/or structures.

4.   Tilling and grading of impacted areas and restoration site.

5.   Installation of monitoring wells (for site hydrology monitoring) within restoration site.

6.   Planting of native tree and shrub species within all impacted areas and the adjacent restoration site, consistent with planting plan.

---

[5] http://www.rpmecosystems.com/

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 15 of 26

7.  Short term adaptive management would include: (1) planting native tree and shrub species to replace mortality that occurs over the first year of compliance monitoring; and/or (2) control of invasive non-native species which establish within restoration site.

The following table summarizes proposed plantings within the impacted waters / wetlands within the project site:

| Scientific Name | Common name | Density (# / Acre) | Total Number to be Planted |
|---|---|---|---|
| Quercus bicolor | Swamp White Oak | 10 | 71 |
| Quercus lyrata | Overcup oak | 10 | 71 |
| Quercus palustris | Pin oak | 10 | 71 |
| Quercus michauxii | Swamp Chestnut Oak | 10 | 71 |
| Quercus macrocarpa* | Bur  oak | 5 | 36 |
| Carya laciniosa | Kingnut hickory | 5 | 36 |
| Carya illoinensis | Sweet pecan | 5 | 36 |
| Carya cordiformis | Bitternut hickory | 5 | 36 |

The following table summarizes proposed plantings within the adjacent restoration project at the site (12.2 acre Oak-Hickory mixed hardwood Palustrine forest):

| Scientific Name | Common name | Density (# / Acre) | Total Number to be Planted |
|---|---|---|---|
| Quercus bicolor | Swamp White Oak | 5 | 61 |
| Quercus lyrata | Overcup oak | 10 | 122 |
| Quercus palustris | Pin oak | 5 | 61 |
| Quercus michauxii | Swamp Chestnut Oak | 5 | 61 |
| Quercus macrocarpa* | Bur  oak | 5 | 61 |
| Carya laciniosa | Kingnut hickory | 10 | 122 |
| Carya illoinensis | Sweet pecan | 5 | 61 |
| Carya cordiformis | Bitternut hickory | 5 | 61 |
| Ulmus americana | American elm | 10 | 122 |

Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report

Mt. Erie Pipe Line Release
Project
Page 16 of 26

The following table summarizes proposed plantings within the adjacent restoration project at the site (2 acre Oak-Hickory-Elm mixed hardwood Palustrine forest:

| Scientific Name | Common name | Density (# / Acre) | Total Number to be Planted |
|---|---|---|---|
| Carya laciniosa | Kingnut hickory | 10 | 20 |
| Quercus lyrata | Overcup oak | 10 | 20 |
| Ulmus americana | American elm | 10 | 20 |
| Quercus michauxii | Swamp Chestnut Oak | 10 | 20 |
| Quercus palustris | Pin oak | 7 | 14 |
| Carya illoinensis | Sweet pecan | 6 | 12 |
| Quercus macrocarpa* | Bur oak | 7 | 14 |
| Cephalanthus occidentalis | Buttonbush | 30 | 60 |

Compliance monitoring will be conducted following all restoration plantings for a minimum of 5 years, consistent with requirements of the NWP.  If the performance standards defined below are met after the 5 years period, the USACE will be petitioned to reduce further monitoring requirements.  If performance standards are not met after 5 years, compliance monitoring will continue until a point when they are met. Compliance monitoring will focus on survivorship of native trees and shrub plantings, as well as monitoring the establishment of invasive non-native plant species.

### 3.3  Compensatory Project Scaling

As described above, the planned compensatory restoration will have three elements:

- Enhancement of habitat for the Indiana Bat,
- Enhancement of habitat for aquatic-dependent wildlife, and
- Tree planting in areas of impacts and wetlands restoration in the agricultural fields east of the project site.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 17 of 26

The requirement for NRD under OPA is that lost services be compensated for by the creation of additional service flows that are: comparable in what services are provided (e.g., habitat type) and geographically nearby to the area injury.  This is the "in place, in kind" consideration for compensatory restoration.

The determination of the quantity of compensatory services provided by restoration projects is typically based on an analysis of the services the injured site provides before, during, and after damages have occurred.  One commonly used method to calculate these losses is based on the quality of the habitat injured, the total area of injury, and the duration of injury[6].  To compensate for a loss of services in an area of a certain habitat type over a period of time, an equivalent area of that habitat type would be restored, or otherwise created, and the habitat would provide those services for a certain period of time.  The net effect of the restoration would be to create additional ecological service or function, to equal or exceed the total services loss.

For this site, the proposed wetlands restoration project includes both the restoration of the injured wetlands and the restoration of agricultural fields to wetlands.  The following assumptions can be applied to the evaluation of the value of the restoration:

- The injured site wetlands will be restored, thereby limiting their injury and loss of service to a relatively limited period of time.
- The restored adjacent wetlands (currently an agricultural field) will provide services for a period of time substantially longer than the period during which site wetlands were impacted by the spill event[7].
- The proposed compensatory restoration project will result in the restoration of equivalent wetlands habitat and function in an area directly adjacent to the Site – satisfying the requirement that restoration be "in place".

---

[6] This is Habitat Equivalency Analysis.  See http://www.darrp.noaa.gov/library/pdf/heaoverv.pdf for an overview of the method.

[7] A deed restriction will protect all restored areas in perpetuity.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 18 of 26

- The proposed compensatory restoration project will result in the restoration of an adjacent area twice the size of the affected (injured) wetlands on the Site, whose services are sufficient to replace the interim lost use of the natural resources during the recovery period.
- The restored adjacent wetlands will provide a variety of ecological services that are similar to those impacted on the Site, thereby satisfying the requirement that restoration be "in kind" (i.e., resource-to-resource).
- The enhanced function of the restored adjacent wetlands will provide substantially higher ecosystem functioning than those offered by an agricultural field, thereby generating a "lift" in function and ecological services (natural resources) as a result of the restoration.

The result of the proposed compensatory restoration will be to provide additional natural resource services:

- That are similar in nature to those injured on the Site,
- For a period of time far in excess of the period of injury on the Site, and
- In an area twice the size of the injured wetlands on the Site.

**3.4  Compensatory Projects Effects**

The planting and other work planned in the field adjacent to the Site represents the majority of planned compensatory restoration.  The Department of the Interior Departmental Manual, 516 DM 6, Appendix 1, Section 1.4 identifies "classes of actions which do not individually or cumulatively have a significant effect on the human environment."  NRDA restoration plans prepared under CERCLA or the Oil Pollution Act are excluded under 1.4(11), "when only minor or negligible change in the use of the affected areas is planned."

The effects of the planned compensatory restoration activities at the Site may be summarized as follows:

- The bat houses have no anticipated effects on any use of the area.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 19 of 26

- The field will be restored to its previous condition as wetlands associated with the former channel of the Elm River; this activity converts an agricultural field into a wetlands, which is an improvement in its natural resources value.
- Excavation, planting, or other disturbance in the field will be restricted to the "plow zone" which limits the potential to impact archeological or other human resources potentially present in the field.
- Erosion controls will be implemented during restoration activities.
- The field currently has no recreational value, and no known historical value.
- Marathon owns the field, and therefore changes to the land use of the field will have no economic impact.

The effects of the restoration on the use of the affected area are minimal, and will results in substantial increase in the natural resources and the services they provide. As such, these restoration activities meet the description of the Departmental Manual as not having "significant effects".

### 4.   Compliance Monitoring and Adaptive Management Plan

Compliance monitoring for a period of at least 5 years will be conducted following all restoration plantings.  This is also consistent with requirements of the Nationwide Permit program.  If performance standards as defined below are met after 5 years, MPL will petition to be released from further monitoring requirements.  If performance standards are not met after 5 years, compliance monitoring will continue until a point when they are met.  Compliance monitoring will focus on survivorship of native trees and shrub plantings, as well as monitoring the establishment of invasive non-native plant species.

The performance standards for this restoration plan are:

1.   Survival of 90% of planted trees if using RPM plant stock, or 80% survivorship if using bare root seedlings.

2.   A density of at least 60 stems/acre if using RPM plant stock, or 450 stems/acre if using bare root seeding after five years of compliance monitoring.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 20 of 26

3.  No tree species will comprise more than 25% percent of the total tree density after five years of compliance monitoring

4.  Herbaceous cover over a minimum of 70% of the restored areas. At a time when tree canopy is greater than 60% of the restored areas, than this herbaceous cover is anticipated to decrease and will not significantly affect the functioning of the palustrine forest ecosystem.

5.  Parameters of the USACE *Wetlands Delineation Manual* (Environmental Laboratory, 1987) and 2008 *Draft Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Midwest Region* (USACE, 2008) are met within the restored areas.

As part of the compliance monitoring program, five permanent sample locations will be established in the restored impacted areas, and fourteen permanent sample locations will be established within the restoration site. Fifteen permanent photograph locations will also be established throughout the restored impacted areas and restoration site. Compliance monitoring will consist of a site visits twice per year (spring and autumn) by a qualified wetland scientist. The spring visit will be focused on a qualitative assessment of non-native invasive species establishment within the restoration site, downloading data from each water level recorder, and taking photographs at all photo locations. The autumn site visit will consist of data collection at all permanent sample plot locations, downloading water level recorder data, and taking photographs at all photo locations.

Vegetation will be assessed using a 1/10-acre (radius 37.3 feet) circular plot for the tree and shrub stratum, and a 1/100-acre (radius 11.8 feet) circular plot for the herbaceous and vine stratum. Plots will be centered by a 5-foot metal fence post placed immediately following all restoration plantings. A GPS position will be taken for each permanent sample plot location. GPS positions and final monitoring locations will be provided as part of the baseline monitoring report. Within each plot, six measurements will be annually taken: (1) identification of all species present; (2) numbers of all tree identified tree and shrub species; (3) percent cover for each species; (4) total percent cover of vegetation; (5) total percent cover of trees; and (6) total percent cover of herbaceous species.

Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report

Mt. Erie Pipe Line Release
Project
Page 21 of 26

A baseline monitoring report will be prepared immediately following all planting activities in order to establish baseline conditions to compare subsequent monitoring results. An annual monitoring report will be provided by January 31st of the following year subsequent to all data collection. The overall objective of each monitoring report will be to illustrate progress toward, or deviation from, stipulated performance standards. This will be done by summarizing data, as well as providing comparisons to data collected in previous years.

A final petition to be released from monitoring requirements will include a full wetland delineation survey of the restored areas. The survey will include established sampling locations along the surveyed boundary consistent with methods outlined in USACE *Wetlands Delineation Manual* (Environmental Laboratory, 1987) and 2008 *Draft Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Midwest Region* (USACE, 2008).

### 4.1  Adaptive Management

Adaptive management will be performed on-site based upon observations and results of the compliance monitoring program. The objective of adaptive monitoring is to facilitate development of the restored palustrine forested wetland community, and maintain progress towards articulated performance standards.

The ability to react to the dynamic nature of restored systems, in order to increase the likelihood of restoration success, is the basis for adaptive management. Through analysis of data during monitoring events, management recommendations will be made and implemented. Data collected regarding the performance standards will be evaluated to gauge whether satisfactory progress is being made. If progression toward attainment of performance standards is not observed, management actions will be recommended and implemented to increase the likelihood these standards are met within the 5 year monitoring period. Each of the steps in the adaptive management program (i.e., monitoring, assessment, evaluation, recommendation, and implementation) will interact with the preceding steps to create a continuous process that builds upon originally stated goals and lessons learned from past experiences.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 22 of 26

If progress toward meeting performance standards is not evident following any complete year of monitoring, potential for success of the mitigation area will be evaluated, and contingency measures will be proposed in the annual monitoring report. Potential adaptive management actions include, but potentially are not limited to:

1.  Additional enhancement plantings will be installed after the first year of compliance monitoring, and in subsequent years, if necessary to maintain the desired tree density of either 60 stems/acre of RPM stock or 450 stems/acre of bare root seedlings.

2.  Control invasive non-native plant species.  Depending upon the weeds of concern that establish within the restoration site, maintenance will consist of (1) manual control), and/or (2) chemical control. Chemical control will only be used on species where manual control has been determined to not be effective, and after consultation with IEPA and IDNR. A control schedule will be dependent upon the weeds of concerns that establish within the restoration site.

4.1.1   Bat House Maintenance

Little maintenance is required after installing a bat house.  Annual monitoring will only ensure that the integrity of the predator guard is maintained.

4.1.2   Wood Duck Box Maintenance

The installed wood duck boxes will also require annual maintenance.  During the fall monitoring, old nesting materials should be removed from each box and replaced with fresh wood shavings. In addition, the integrity of the nest box will be annually evaluated and repaired as necessary.  The integrity of the predator guard will be maintained.

**5.   Past and Future Involvement of Responsible Party**

MPL has been (and will continue to be) the active lead and responsible party on resolution of NRD matters pertaining to the August 2008 crude oil release from the

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 23 of 26

MPL-owned pipe line. All activities pertaining to resolution of matters associated with
NRD have been reviewed and directed by MPL and MPL's authorized
representatives. All proposed and future activities at the site (whether pertaining to
NRD and/or restoration/remediation) will also be directed by MPL and MPL's
authorized representatives.

## 6.  Agencies Contacted

Following is a list of Federal and State agencies (primary point of contact noted only)
contacted and communicated with throughout implementation of emergency
response measures, reconnaissance activities, site characterization, monitoring,
remediation, and mitigation:

>       United States Fish & Wildlife Service
>       Rock Island Field Office
>       1511 47th Avenue
>       Moline, IL 61265
>       Mike Coffey
>       (309) 757-5800 ext. 206
>
>       United States Army Corps of Engineers
>       Louisville District, West Section
>       P.O. Box 489
>       Newburgh, IN 47629-0489
>       Robert Brown
>       (812) 853-7632
>
>       United States Environmental Protection Agency
>       Region 5
>       77 West Jackson Boulevard
>       Mail Code SE-5J
>       Chicago, IL 60604-3507
>       Kevin Turner
>       (618) 997-0115

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 24 of 26

Illinois Environmental Protection Agency
Bureau of Land, Division of Remediation Management
1021 North Grand Avenue, P.O. Box 19276
Springfield, IL 62794-9276
Jody Kershaw
(217) 524-3285

Illinois Department of Natural Resources
Office of Realty and Environmental Planning
One Natural Resources Way
Springfield, IL 62702
Beth Whetsell
(217) 557-7816

Illinois Historic Preservation Agency
1 Old State Capitol Plaza
Springfield, IL 62701-1512
Anne Haaker
(718) 785-4998

## 7.  Public Review and Comment

This Damage Assessment and Restoration Plan report (or DARP) was posted on the
USFWS, Rock Island, Illinois, Ecological Services web site on June 14, 2011
(http://www.fws.gov/midwest/RockIsland/ec/index.html).  A legal notice of availability
was published in "The Times Advocate Newspaper" by the USFWS on June 14, 2011
to solicit comment, issues, or concerns from the public.  The public comment period
was open between the dates of June 14, 2011 to July 26, 2011.  There were no
comments received on the DARP during the public review and comment period.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 25 of 26

## 8.  References

ARCADIS. 2010.  Wetland Delineation Report – Mt. Erie Pipe Line Project.  Prepared
for Marathon Pipe Line Company LLC. Submitted to USACE in September 2010.

ARCADIS. 2010.  Characterization Completion / Remediation Objectives Report.
Prepared for Marathon Pipe Line Company LLC. Submitted to IEPA in August
2010.

ARCADIS, 2011. *Wetland Mitigation Plan*. Mt. Erie Pipe Line Release, Wayne County,
Illinois.

ARCADIS, 2011. *Remedial Action Plan*. Mt. Erie Pipe Line Release, Wayne County,
Illinois.

ARCADIS, 2009. Biological Assessment Report, Endangered Species – Indiana Bat,
ARCADIS, December 2009).

Environmental Laboratory. 1987. Corps of Engineers Wetlands Delineation Manual.
Technical Report Y-87-1. Vicksburg, MS: U.S. Army Engineer Waterways
Experiment Station. (http://el.erdc.usace.army.mil/wetlands/pdfs/wlman87.pdf)

Federal Register.  2008.  Compensatory Mitigation for Losses of Aquatic Resources,
Final Rule.  Environmental Protection Agency.  40 CFR Part 230.
(http://www.epa.gov/wetlandsmitigation/).

Fehrenbacher, T.A.  2010.  Soil Survey of Wayne County, Illinois.  United States
Department of Agriculture, Natural Resource Conservation Service, in cooperation
with Illinois Agricultural Experiment Station.

Hosner, J.F. and L. S. Minckle. 1963.  Bottomland Hardwood Forests of Southern
Illinois--Regeneration and Succession.  Ecology, Vol. 44, No. 1. pp. 29-41

Leighton, M.M., G.E. Ekblaw, and L. Horberg. 1948. Physiographic divisions of Illinois.
Illinois State Geological Survey, Report of Investigations 129.

**Natural Resources
Damages Assessment
and Restoration Planning
(DARP) Report**

Mt. Erie Pipe Line Release
Project
Page 26 of 26

Missouri Department of Conservation, 2000. *Best Management Practices*.

Norton, E.A., R.S. Smith, E.E. DeTurk, F.C. Bauer and L.H. Smith.  1931. Wayne
County Soils.  University of Illinois Agricultural Experiment Station Soil Report 49.

U.S. Army Engineer Waterways Experiment Station. 1999.  Case Study: Application of
the HGM Western Kentucky Low-Gradient Riverine Guidebook to Monitoring of
Wetland Development.  WRP Technical Notes Collection (TN WRP WG-EV-2.0).
www.wes.army.mil/el/wrp

U.S. Army Corps of Engineers. 2005.  Technical Standard for Water-Table Monitoring
of Potential Wetland Sites. ERDC TN-WRAP-05-2

U.S. Army Corps of Engineers. 2008. Draft Interim Regional Supplement to the Corps
of Engineers Wetland Delineation Manual: Midwest Region.

U.S. Army Corps of Engineers, 1987. *Wetlands Delineation Manual* (Environmental
Laboratory, 1987) (hereafter, 1987 Manual).

U.S. Army Corps of Engineers, 2008. *Draft Interim Regional Supplement to the Corps
of Engineers Wetland Delineation Manual: Midwest Region*.

U.S. Fish & Wildlife Services, 2010. *Biological Opinion*



Prepared By: L.Elsiser Checked By: J.Cosgrove  Reviewed By: R.Barleti  Date:8/25/08
Project B4000816.0001.00001
G:\Dept\GIS\Cabin\Cabin Gate Spill\MXDs\Figure1_SiteLocation.mxd – 8/23/2008 @ 7:22:00 AM

LEGEND:
● Point of Release
⌐┐ Approximate Site Boundary
◻ Section
◻ Township
— Rivers & Streams
▨ Waterbody
— Roads

NOTE:
1. Data Source:
   Aerial Image - 2007 National Agriculture Imagery Program
   Surface Water Data - USGS National Hydrography Database
   Roads, Section & Township - Illinois Department of Natural Resources

0    2,000    4,000
                Feet
GRAPHIC SCALE

MT. ERIE PIPE LINE RELEASE
MT. ERIE, WAYNE COUNTY, ILLINOIS

SITE LOCATION

🐘 ARCADIS

FIGURE
1



Figure 2 — Immediate Response Activities, as of 9/18/08

MT. ERIE PIPE LINE RELEASE
MT. ERIE, WAYNE COUNTY, ILLINOIS



MARATHON PARCEL MAP
PROPERTY BOUNDARY SURVEY

MT. ERIE PIPE LINE RELEASE
MT. ERIE, WAYNE COUNTY, ILLINOIS

FIGURE 3

LEGEND:
☆ Command Center
● Point of Release
Area of Flow
= = Access Roads
— Roads
- - Rivers & Streams
Waterbody

NOTE:
1. Data Source: Aerial Image - 2007 National Agriculture Imagery
   Program
   Surface Water Data - USGS National Hydrography
   Database
   Oil Stained Soil - Malcolm Pirnie, inc.
   Roads - Illinois DNR

GRAPHIC SCALE
0    500    1,000
Feet

Appendix B
to

Consent Decree in the matter of *United States v. Marathon Pipe Line LLC* (S.D. Ill.)
relating to Natural Resource Damages at the Marathon Pipe Line Site.



Prepared By: L.Ebstser Checked By: J.Cosgrove Reviewed By: R.Bartelt Date:9/23/08
Project IN0DB18.0001.00001
G:\Dept\GIS\Data\Golden Gate Spills\MXD's\Figure1_SiteLocation.mxd - 9/23/2008 @ 7:22:00 AM

LEGEND:
- Point of Release
- Approximate Site Boundary
- Section
- Township
- Rivers & Streams
- Waterbody
- Roads

NOTE:
1. Data Source:
   Aerial Image - 2007 National Agriculture Imagery Program
   Surface Water Data - USGS National Hydrography Database
   Roads, Section & Township - Illinois Department of Natural Resources

0   2,000   4,000
Feet
GRAPHIC SCALE

MT. ERIE PIPE LINE RELEASE
MT. ERIE, WAYNE COUNTY, ILLINOIS

SITE LOCATION

ARCADIS

FIGURE
1

Appendix C
to

Consent Decree in the matter of *United States v. Marathon Pipe Line LLC* (S.D. Ill.) relating to
Natural Resource Damages at the Marathon Pipe Line Site.

Restoration Projects Time Schedule

Provided that the U.S. Army Corps of Engineers has issued the Nationwide Permit, for
which Marathon submitted the Permit Application on September 9, 2010, and the final Wetland
Mitigation Plan dated April 2011, the Work required pursuant to this Consent Decree and the
DARP Report shall be performed in accordance with the following schedule:

| | |
|---|---|
| Removal of fill material, grading work and site preparation | Commenced on or before July 9, 2012 |
| Bat house and wood duck box installation per Paragraph 3.2 of the DARP Report | Commenced on or before July 30, 2012 |
| Planting of trees and shrubs per Paragraph 3.2 of the DARP Report | Commenced on or before July 30, 2012 |
| Completion of Work | November 30, 2012 |